LAWSON, J.
The State timely appeals a final order setting aside the jury’s guilty verdicts against Gilbert Dudley, III, and dismissing the charges against him. We reverse and remand with directions that the verdicts be reinstated and that the court proceed to sentencing. To the extent that this opinion is inconsistent with our prior panel decision in State v. Torresgrossa, 776 So.2d 1009 (Fla. 5th DCA 2001), we recede from Torresgrossa. We also certify conflict with the First District’s decision in Mathis v. State, 682 So.2d 175 (Fla. 1st DCA 1996).
The State charged Dudley with two counts of sexual battery on a mentally defective person. In count I, the State alleged that on or about March 21, 2008, the Defendant penetrated or had union with the victim’s vagina or anus. In count II, the State alleged that in 2007 the Defendant penetrated or had union with the victim’s vagina or mouth. Both counts alleged that the victim was mentally defective, and that Dudley had reason to believe or had actual knowledge that the victim was mentally defective. See § 794.011(4)(e), Fla. Stat. (2007).
After the jury returned guilty verdicts on both counts, the trial court set aside the verdicts and dismissed the charges, finding that the State’s evidence at trial was insufficient to support a jury finding that the victim was a “mentally defective” person as defined in section 794.011(4)(e), Florida Statutes. That statute defines “mentally defective” to mean “a mental disease or defect which renders a person temporarily or permanently incapable of appraising the nature of his or her conduct.” § 794.011(1)(b), Fla. Stat. (2007).
Contrary to the trial judge’s conclusion, the State’s evidence was clearly sufficient to support a jury finding that the victim was mentally defective, as defined by the statute.
*748 First, the State presented testimony from the victim. It is clear from this testimony that the victim, who was twenty-one years old at the time of trial, has a mental and developmental age far below her physical age, and that her ability to appraise the nature of many things is severely limited. For example, the victim repeatedly referred to Dudley’s sexual organ as his “popsicle,” and testified to the times when Dudley put his “popsicle” inside her. She explained that she did not want to do this but that “he told me if I don’t do it, he was gonna punch me.” When asked why she did not immediately tell her mother about the incidents, she said that Dudley promised to take her to the park if she did not tell her mother. The victim’s word choices and phraseology throughout the testimony reflect the mental ability of a young child.
Second, the victim’s special education teacher, Ms. Hook, had worked with the victim for four or five years and also served as the victim’s Special Olympics coach. Ms. Hook testified that the victim was in a class for the mentally disabled who have IQs lower than seventy. Ms. Hook testified that her students, including the victim, need constant supervision as they are not capable of self-direction, and have significant cognitive limitations. Ms. Hook recounted specific instances of the victim’s limitations. For example, the victim does not understand the concept of differing valuations of money or the relative value of things. Ms. Hook explained that if the victim had a $5 bill, the victim could not understand why she could not use the bill to purchase a $13 CD. Similarly, Ms. Hook testified that the victim does not understand abstract concepts such as “in a little while” or “usual.” She further testified that the victim could not rationally process and express her emotions, but would simply cry or stomp her feet if she did not like something.
Third, the victim’s mother testified that her daughter has mild cerebral palsy, has been diagnosed with bi-polar disorder and was simply “not like everyone else.” She explained that if the victim were ill, she would not know to take medication even if a doctor had provided her with it; that she cannot cook because she could burn the house down; that if she observed someone ill and incapacitated, she would not know to call “911” or otherwise seek help, but would probably just watch the person lie there. The mother further described her daughter’s mind as “very childlike,” explaining that she does not know how to count money; does not understand the basics of personal hygiene; is afraid of the dark; and, cannot be left alone for any extended period of time because of her need for constant monitoring. She explained that the victim will never be able to drive due to her limited mental capacity, must generally be separated from other children due to the concern that they would pick on her or persuade her to do inappropriate things, and that she cannot take a bus by herself. According to her mother, the victim is able to do laundry for the family, but only after much assistance, and is able to keep her room clean but needs prompting. The victim likes to watch Disney videos; and, she likes to shop and dance. The victim’s room is decorated in a Tinkerbell theme. The victim has never had a paying job.
The mother put the victim on birth control in the form of Depo-Provera shots. The mother began taking the victim to get these shots after an incident with an emotionally handicapped young man which caused the mother to worry about her daughter being taken advantage of and getting pregnant. The victim has been committed to a mental institution four times.
*749 Finally, the State presented the testimony of Dr. Malcolm J. Graham, III, a psychologist who does evaluations for a number of different governmental agencies and who has been qualified as an expert witness in court many times. He testified at length as to the victim’s mental limitations; opined that the victim is mentally retarded, in the moderate range; reported that the victim scored sixty-one on her verbal IQ scale, fifty on her performance IQ, and fifty-one on her full scale, putting her at less than one percentile. In other words, at least ninety-nine percent of the people who take the test scored at a higher intelligence level than the victim. Dr. Graham testified that the victim could not remember for five minutes even one of four words that he asked her to remember during a conversation; that she cannot name one single current event happening anywhere in the world; and, that she cannot perform even the simplest arithmetic calculations, such as 3 + 1. He opined that the victim will always need to be in a highly structured environment where she will be cared for, as she will never be able to function independently. Significantly, Dr. Graham testified that in his professional opinion the victim suffers from a mental defect that renders her “permanently incapable of appraising the nature of her conduct” in the context of engaging in sexual intercourse — the very definition of “mentally defective” contained in the statute pursuant to which the State prosecuted Dudley.
It was undisputed that Dudley was fully aware of the victim’s mental condition. After becoming romantically involved with the victim’s mother, Dudley moved in with the family and had become “like a father figure” to the victim.[1] At some point, Dudley lost his job, and then became the primary caregiver for the victim when her mother was at work. It was Dudley who had taken the victim to her appointment with Dr. Graham for a disability benefits evaluation; and, it was Dudley who initially gave Dr. Graham a full background and factual explanation of the victim’s mental limitations, before Dr. Graham began his own testing and evaluation. Dudley also admitted to his two sexual encounters with the victim, although he testified that the victim “came on to” him both times. He also testified that he believes the victim can work and do some things for herself, and that he believes the victim to be more intelligent than most others recognize.
It is unclear what procedural mechanism the trial judge was following when he sua sponte announced that he was setting aside the verdicts and dismissing the charges in this case. Dudley had never moved to dismiss the charges; the judge had denied Dudley’s motions for judgment of acquittal at trial; and, there were no post-trial motions pending. Dudley was simply awaiting sentencing. In any event, “[t]he sufficiency of the evidence to support a particular criminal charge, whether evaluated by the trial court or by an appellate court, is a question of law.” Jones v. State, 790 So.2d 1194, 1197 (Fla. 1st DCA 2001). Accordingly, we determine whether the evidence was sufficient to support the verdicts de novo. A jury’s guilty verdict should not be set aside for a lack of evidence unless “there is no view of the evidence which the jury might take favorable [to the State] that can be sustained under the law.” Hunter v. State, 8 So.3d 1052 (Fla.2008), cert. denied, — U.S. -, 129 *750 S.Ct. 2005, 173 L.Ed.2d 1101 (2009) (quoting Coday v. State, 946 So.2d 988, 996 (Fla.2006), cert. denied, 551 U.S. 1106, 127 S.Ct. 2918, 168 L.Ed.2d 249 (2007)).
The parties cite to five relevant appellate decisions dealing with the sufficiency of the evidence to support a jury finding that a sexual battery victim was “mentally defective” at the time of the crime. Dudley argues for affirmance of the trial court’s dismissal order citing Mathis v. State, 682 So.2d 175 (Fla. 1st DCA 1996) and State v. Torresgrossa, 776 So.2d 1009 (Fla. 5th DCA 2001). The State argues for reversal and reinstatement of the verdicts, citing Hudson v. State, 939 So.2d 146 (Fla. 4th DCA 2006), Schimele v. State, 784 So.2d 591 (Fla. 4th DCA 2001) and Bowman v. State, 760 So.2d 1053 (Fla. 4th DCA 2000). In our view, the facts from Hudson, Schimele and Bowman more closely match the facts in this case, and both Mathis and Torresgrossa are distinguishable.
In Schimele, the Fourth District found that the state had presented sufficient evidence that the alleged victim was mentally defective where a psychologist testified that the twenty-six year old mentally “retarded” victim was obviously mentally impaired based upon his “childlike speech,” and other overt characteristics. The expert testified that the victim scored a fifty-three (in the “moderately impaired range”) on the Wechsler Adult Intelligence Scale, the standard IQ test. In comparison, the victim in our case had a slightly lower overall score of fifty-one. Although the victim in Schimele was able to work three days a week, for three hours a day as a supermarket bagboy, he required a similar level of supervision and care as the victim in our case. He had a similarly “young developmental age,” limited “personal care ability,” and “almost no mathematical ability.” The psychologist in Schimele testified that the victim in that case was “incapable of understanding the nature of his conduct and its ramifications” and “was not able to give a knowing, voluntary, intelligent consent to having sexual relations” because of his mental limitations. Schimele, 784 So.2d at 593.[2]
Bowman is also similar, holding that evidence of a low IQ score and comparable testimony from a school psychologist regarding the limited mental ability of the purported victim were sufficient to support a jury finding that the victim was mentally defective. Although the Bowman panel included fewer details regarding the mental ability of the victim in its opinion, the decision relates that the victim was in his early twenties but “behaves like a four or five year old in some respects, and a nine or ten year old in others.” Bowman, 760 So.2d at 1053. The victim was unable to read or write, but could sign his name. Id. A school psychologist testified that a person like the victim “should not be left to run an errand or cross the street on his own.” Id. at 1055.
In Hudson, the Fourth District found the evidence sufficient to go to the jury on the issue of whether the victim was mentally defective in a sexual battery prosecution, even absent expert testimony, where the investigating detective testified that he believed the victim to be about seven to nine years old mentally, and the nurse who examined the twenty-six year old victim testified that the victim was “childlike and delayed,” and “documented that [the victim] appeared to be mentally challenged.” *751 The evidence summarized in the Hudson opinion regarding that victim’s mental limitations is less substantial than the evidence presented regarding the victim’s mental limitations in our case.
Although examination of the sufficiency of the evidence on any issue is obviously a case-specific and fact-intensive inquiry, the relevant facts regarding the victim’s mental capacity are close enough in our case to the facts found sufficient in Schimele, Bowman and Hudson that it would be difficult to affirm dismissal of the charges here without conflicting with those decisions from the Fourth District.
By contrast, in Mathis the First District reversed a conviction based upon the appellate panel’s conclusion that the evidence was legally insufficient to permit a jury to find that the victim in that case was “mentally defective” on the date of the alleged sexual battery. Mathis is distinguishable for two reasons. First, the testimony in Mathis established the victim to be “right at the upper end of’ the “trainable mentally handicapped range,” and the mental capacity evidence regarding the victim was based upon observations made and testing done “fifteen months before the date of the alleged sexual battery.” Mathis, 682 So.2d at 180. Because the evidence in Mathis suggested that the mental capacity of the victim would improve with time, the panel was properly concerned about the lack of evidence addressing the mental capacity of the victim as of the date of the charged crime. There is no similar concern in our case, because the witnesses testified regarding the victim’s mental condition at the time of the crimes. Additionally, the victim’s mental condition here is permanent.
Second, the Mathis panel expressed special concern regarding the fact that no expert opined that the victim suffered from “ ‘a mental disease or defect which rendered] [her] temporarily or permanently incapable of appraising the nature of ... her conduct.’ ” Id. (quoting § 794.011(1)(b), Fla. Stat. (1993)). In our case, Dr. Graham gave that opinion.
Our prior panel decision in Torresgrossa is also readily distinguishable in that the victim in that case was measurably more advanced, in terms of her mental capacity, than the victim here. Although classified by the state’s expert as mildly mentally retarded, the alleged victim in Torresgros-sa held a high school diploma, had been a licensed driver, had held employment, had prior consensual sexual relationships with a previous boyfriend who she had considered marrying, and understood that the defendant was married at the time that she engaged in sex with him. Torresgrossa, 776 So.2d at 1010. She had obtained a prescription for birth control pills, and knew that their purpose was to ensure that she did not become pregnant when engaging in sex. Significantly, the state’s expert in Torresgrossa conceded that he “thought [the victim’s] sexual relations with her pri- or boyfriend were consensual.” Id. at 1010-11. That concession itself would seem to preclude a finding that the victim was incapable of appreciating the nature of her conduct regarding sex.
Although both Mathis and Torresgrossa are factually distinguishable, we find the analysis in Mathis troubling in that it suggests an unreasonably narrow reading of the term “mentally deficient.” In short, Mathis equates “mental deficiency” with “legal insanity,” and further suggests that anyone with a sufficient mental capacity to competently testify in court cannot be found “mentally deficient.” Torresgrossa could be read as approving of Mathis on that point. The Fourth District in Bowman, however, noted its disagreement with this portion of the Mathis panel’s analysis, explaining:
*752 We do not see a problem, as the Mathis court may have, with a victim being found able to understand the moral obligation to testify truthfully, and still being mentally defective under the statutory definition. It is not unusual for a child who is actually or mentally five years old to sufficiently understand the moral obligation to tell the truth so as to be competent to testify. Telling the truth is a basic value of our society which is drummed into the heads of children as soon as they are able to reason. The fact that such a child is competent to testify, however, is not inconsistent with being mentally defective under section 794.011(1)(b), Florida Statutes. Unlike telling the truth, the inappropriateness of the type of sexual activity occurring in Mathis or this case is not necessarily something which is normally discussed with a person who is mentally only five years old.
Bowman, 760 So.2d at 1055.
We agree with the Fourth District on this point. “Mentally deficient” cannot reasonably be read to mean a total lack of mental capacity, as the trial judge in our case seems to have concluded based upon language in Mathis and Torresgrossa. “Deficient” means “lacking in some ... quality” or “not up to a normal standard.” Merriam-Webster Dictionary (2011), http://www.merriam-webster.com/ dictionary/deficient. It does not mean “devoid of’ or “totally lacking.” Similarly, the statutory definition of “mentally deficient,” that is, “incapable of appraising the nature of his or her conduct,” connotes significantly diminished judgment, but not a complete and total lack of mental awareness.
Accordingly, to the extent that Mathis can be read as equating “mental deficiency” with competence to testify, or to mean a total or complete lack of mental capacity or understanding, we disagree and conflict with Mathis. To the extent that Torresg-rossa positively relied on Mathis as to this narrow point, we recede from Torresgros-sa.
REVERSED AND REMANDED WITH DIRECTIONS; CONFLICT CERTIFIED.
ORFINGER, C.J., GRIFFIN, SAWAYA, PALMER, MONACO, TORPY, EVANDER, COHEN, and JACOBUS, JJ., concur.

. Dudley had been an associate pastor at a church attended by the victim’s family. The victim’s mother and father had been experiencing marital challenges and the mother began marriage counseling with Dudley. The relationship between the victim’s mother and Dudley had progressed from there. The mother ultimately divorced her husband, and Dudley moved in with the family.

. Similarly, in this case, Dr. Graham opined that the victim suffers from a mental defect that renders her permanently incapable of appraising the nature of her conduct in the context of engaging in sexual intercourse, that she is not capable of giving an intelligent, knowing and voluntary consent to engaging in sexual activity.