# Supreme Court of Florida

_____

No. SC11-2292
_____

**GILBERT DUDLEY, III,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

[May 15, 2014]

PER CURIAM.

This case is before the Court for review of the decision of the Fifth District Court of Appeal, sitting en banc, in State v. Dudley, 64 So. 3d 746, 747 (Fla. 5th DCA 2011), which reversed the trial court's dismissal of the criminal charges against the defendant, Gilbert Dudley, III, for sexual battery on a person defined by Florida statute as "mentally defective," and ordered that the jury's guilty verdicts be reinstated. The Fifth District certified that its decision directly conflicts with the decision of the First District Court of Appeal in Mathis v. State, 682 So. 2d 175 (Fla. 1st DCA 1996), as to the proper interpretation of the statutory term "mentally

defective."[1]  Dudley, 64 So. 3d at 752.  We have jurisdiction.  See art. V, § 3(b)(4), Fla. Const.

For the reasons we explain, we agree with the Fifth District in Dudley that the First District's decision in Mathis improperly equated the term "mentally defective" with the distinct concepts of legal insanity and competence to testify. We also agree with the Fifth District that the statutory definition of "mentally defective" does not, as the First District's decision in Mathis suggests, require "a total or complete lack of mental capacity or understanding."  Dudley, 64 So. 3d at 752.  We therefore approve the Fifth District's decision in Dudley, consistent with the analysis we adopt in this opinion, and disapprove the First District's statutory interpretation in Mathis.

## FACTS AND PROCEDURAL HISTORY

The State charged Dudley in a two-count information with unlawful commission of a sexual battery on a "mentally defective" person over the age of twelve, in violation of section 794.011(4)(e), Florida Statutes (2007), which provides as follows:

---

1.  In its analysis, the Fifth District conflated the statutory term "mentally defective" with the term "mentally deficient."  The term "mentally deficient," referenced by the Fifth District in its opinion, is not contained in the statute or in Mathis.  See § 794.011(1)(b), Fla. Stat. (2007); Dudley, 64 So. 3d at 751-52.  The Fifth District's use of the incorrect term appears to have been inadvertent.

(4) A person who commits sexual battery upon a person 12 years of age or older without that person's consent, under any of the following circumstances, commits a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, s. 775.084, or s. 794.0115:

. . . .

(e) When the victim is mentally defective and the offender has reason to believe this or has actual knowledge of this fact.

The term "mentally defective" is defined by section 794.011(1)(b), Florida Statutes (2007), as "a mental disease or defect which renders a person temporarily or permanently incapable of appraising the nature of his or her conduct."

During trial, the victim's mother testified that she met Dudley while he was an assistant minister at her church. Shortly after she separated from her husband, the victim's mother and Dudley began dating, and Dudley subsequently moved into the mother's home, where the victim, who was in her late teens, also resided. Dudley watched after the victim, took her to medical appointments, and drove her home from school. Both the victim and her mother testified that the victim viewed Dudley as a father figure.

After Dudley had been living in the home for some time, the victim told her mother that Dudley had been having sexual intercourse with her. The victim testified that Dudley forced her to remove her clothes and threatened to punch her if she refused to comply. She stated that Dudley had forced his "popsicle" into her vagina and anus while he touched her breasts. She further testified that during intercourse, Dudley asked her, "Do you want to have a boyfriend? Come on, baby,

let me teach you how to do this." The victim also recounted another episode in which Dudley again placed his "popsicle" in her vagina and continued intercourse to the point of ejaculation. When asked why she did not immediately inform her mother of the conduct, the victim testified that Dudley had promised to take her to the park if she kept these acts a secret.

In addition, the victim's mother testified that, at the request of an investigator, she met Dudley for dinner while wearing a recording device. During dinner, Dudley admitted that he had engaged in intercourse with the victim twice, but claimed that the victim had made the sexual advances toward him.

The State also presented a videotaped interview between an investigator and Dudley. During the interview, Dudley's recollection of the details of his sexual encounters with the victim varied greatly from those described in the testimony of the victim. In particular, he characterized the victim as the sexual aggressor, who on multiple occasions attempted to perform oral sex on him either without his consent or against his direction. On one occasion, Dudley claimed that he was awakened by the victim performing oral sex on him in his bedroom. On another occasion, he contended that while watching television in the living room, the victim "all of the sudden . . . got on her knees and started pulling my pants back and started [performing oral sex]." On this occasion, Dudley asserted that after he stopped the victim from performing oral sex, she led him into her bedroom and

forced him to engage in intercourse with her.  Despite initially claiming that he immediately removed his penis after inserting it into the victim's vagina, Dudley later admitted during the interview that he ejaculated inside both the victim's mouth and vagina.

As to the victim's mental limitations, the Fifth District set forth the pertinent testimony from trial as follows:

> First, the State presented testimony from the victim.  It is clear from this testimony that the victim, who was twenty-one years old at the time of trial, has a mental and developmental age far below her physical age, and that her ability to appraise the nature of many things is severely limited.  For example, the victim repeatedly referred to Dudley's sexual organ as his "popsicle," and testified to the times when Dudley put his "popsicle" inside her.  She explained that she did not want to do this but that "he told me if I don't do it, he was gonna punch me."  When asked why she did not immediately tell her mother about the incidents, she said that Dudley promised to take her to the park if she did not tell her mother.  The victim's word choices and phraseology throughout the testimony reflect the mental ability of a young child.
>
> Second, the victim's special education teacher, Ms. Hook, had worked with the victim for four or five years and also served as the victim's Special Olympics coach.  Ms. Hook testified that the victim was in a class for the mentally disabled who have IQs lower than seventy.  Ms. Hook testified that her students, including the victim, need constant supervision as they are not capable of self-direction, and have significant cognitive limitations.  Ms. Hook recounted specific instances of the victim's limitations.  For example, the victim does not understand the concept of differing valuations of money or the relative value of things.  Ms. Hook explained that if the victim had a $5 bill, the victim could not understand why she could not use the bill to purchase a $13 CD.  Similarly, Ms. Hook testified that the victim does not understand abstract concepts such as "in a little while" or "usual."  She further testified that the victim could not rationally

- 5 -

process and express her emotions, but would simply cry or stomp her feet if she did not like something.

Third, the victim's mother testified that her daughter has mild cerebral palsy, has been diagnosed with bi-polar disorder and was simply "not like everyone else." She explained that if the victim were ill, she would not know to take medication even if a doctor had provided her with it; that she cannot cook because she could burn the house down; that if she observed someone ill and incapacitated, she would not know to call "911" or otherwise seek help, but would probably just watch the person lie there. The mother further described her daughter's mind as "very childlike," explaining that she does not know how to count money; does not understand the basics of personal hygiene; is afraid of the dark; and, cannot be left alone for any extended period of time because of her need for constant monitoring. She explained that the victim will never be able to drive due to her limited mental capacity, must generally be separated from other children due to the concern that they would pick on her or persuade her to do inappropriate things, and that she cannot take a bus by herself. According to her mother, the victim is able to do laundry for the family, but only after much assistance, and is able to keep her room clean but needs prompting. The victim likes to watch Disney videos; and, she likes to shop and dance. The victim's room is decorated in a Tinkerbell theme. The victim has never had a paying job.

The mother put the victim on birth control in the form of Depo-Provera shots. The mother began taking the victim to get these shots after an incident with an emotionally handicapped young man which caused the mother to worry about her daughter being taken advantage of and getting pregnant. The victim has been committed to a mental institution four times.

Finally, the State presented the testimony of Dr. Malcolm J. Graham, III, a psychologist who does evaluations for a number of different governmental agencies and who has been qualified as an expert witness in court many times. He testified at length as to the victim's mental limitations; opined that the victim is mentally retarded, in the moderate range; reported that the victim scored sixty-one on her verbal IQ scale, fifty on her performance IQ, and fifty-one on her full scale, putting her at less than one percentile. In other words, at least ninety-nine percent of the people who take the test scored at a higher intelligence level than the victim. Dr. Graham

testified that the victim could not remember for five minutes even one of four words that he asked her to remember during a conversation; that she cannot name one single current event happening anywhere in the world; and, that she cannot perform even the simplest arithmetic calculations, such as 3 + 1. He opined that the victim will always need to be in a highly structured environment where she will be cared for, as she will never be able to function independently. Significantly, Dr. Graham testified that in his professional opinion the victim suffers from a mental defect that renders her "permanently incapable of appraising the nature of her conduct" in the context of engaging in sexual intercourse—the very definition of "mentally defective" contained in the statute pursuant to which the State prosecuted Dudley.

It was undisputed that Dudley was fully aware of the victim's mental condition. After becoming romantically involved with the victim's mother, Dudley moved in with the family and had become "like a father figure" to the victim. At some point, Dudley lost his job, and then became the primary caregiver for the victim when her mother was at work. It was Dudley who had taken the victim to her appointment with Dr. Graham for a disability benefits evaluation; and, it was Dudley who initially gave Dr. Graham a full background and factual explanation of the victim's mental limitations, before Dr. Graham began his own testing and evaluation. Dudley also admitted to his two sexual encounters with the victim, although he testified that the victim "came on to" him both times. He also testified that he believes the victim can work and do some things for herself, and that he believes the victim to be more intelligent than most others recognize.

Dudley, 64 So. 3d at 748-49 (footnote omitted).

At the conclusion of the trial, the jury returned guilty verdicts on both counts of sexual battery on a person defined by statute as "mentally defective." Shortly thereafter, the trial court issued an order concluding that the State had not presented "sufficient credible evidence" to satisfy its burden of proving that the victim was "mentally defective" beyond a reasonable doubt, as defined by section

- 7 -

794.011(1)(b). Specifically, the trial court explained that the Fifth District's decision in State v. Torresgrossa, 776 So. 2d 1009 (Fla. 5th DCA 2001), "applied the statutory definition of mentally defective that this court believes is appropriate" in a situation with similar facts to conclude that the alleged victim was not "mentally defective." Because the trial court held that the State had failed to prove an essential element of the crimes charged under section 794.011(4)(e), the trial court set aside the guilty verdicts and dismissed the charges.

On appeal, the Fifth District, en banc, unanimously reversed the trial court, reinstated the guilty verdicts, and directed the trial court to proceed with sentencing. Dudley, 64 So. 3d at 747. The Fifth District held that the evidence presented by the State during trial was "clearly sufficient to support a jury finding that the victim was mentally defective, as defined by the statute." Id.

After reviewing the trial testimony as to the victim's mental limitations, the Fifth District compared the facts of this case with five other Florida appellate cases and determined that the facts of this case more closely resembled those in Hudson v. State, 939 So. 2d 146 (Fla. 4th DCA 2006); Schimele v. State, 784 So. 2d 591 (Fla. 4th DCA 2001); and Bowman v. State, 760 So. 2d 1053 (Fla. 4th DCA 2000), in which the mental defectiveness of the victims were held to be sufficiently established. Dudley, 64 So. 3d at 750-51. The Fifth District found distinguishable the facts in Torresgrossa, 776 So. 2d 1009, which was relied on by the trial court,

and <u>Mathis</u>, 682 So. 2d 175, cases in which the Fifth and First Districts held that the State had not provided sufficient evidence to support a finding that the victim was "mentally defective." <u>Dudley</u>, 64 So. 3d at 751.

Moreover, the Fifth District rejected the First District's interpretation of the statutory term "mentally defective" in <u>Mathis</u>, explaining that "it suggests an unreasonably narrow reading" of the term. <u>Id.</u> The Fifth District's concern stemmed from two aspects of the First District's analysis in <u>Mathis</u>. <u>See id.</u> at 751-52. First, the First District in <u>Mathis</u> found the similarities between the statutory definition of "mentally defective" and the definition of "insanity" used in Florida criminal proceedings to be "apparent." 682 So. 2d at 180. Second, in holding that the State had not presented sufficient evidence to support a finding that the victim was "mentally defective," the First District in <u>Mathis</u> relied heavily on the trial court's finding that the victim was competent to testify. <u>See id.</u> at 180-81. Specifically, the First District noted as follows in <u>Mathis</u>:

> No evidence was offered as to the correlation, if any, between IQ and "mental and developmental age," and the ability to understand "the nature" of one's "conduct." Children having a chronological age younger than the alleged victim's "mental and developmental age" have been found to possess a sufficient understanding of the difference between the truth and a lie, and the moral obligation to relate the former rather than the latter, so as to be competent to testify in court. In fact, in this case, the trial court concluded, we believe correctly, that the alleged victim was competent to testify.

<u>Id.</u> (citations omitted).

The Fifth District interpreted the First District's decision in <u>Mathis</u> as suggesting that if the victim was determined to be competent to testify, a finding of mental defectiveness was precluded as a matter of law. <u>See</u> <u>Dudley</u>, 64 So. 3d at 751-52. The Fifth District disagreed with this analysis, explaining that the statutory definition of "mentally defective" cannot "reasonably be read to mean a total lack of mental capacity, as the trial judge in our case seems to have concluded based upon language in <u>Mathis</u> and <u>Torresgrossa</u>." <u>Id.</u> at 752.

Explaining that the statutory definition of "mentally defective," which includes the key phrase "incapable of appraising the nature of his or her conduct,"[2] indicates "significantly diminished judgment, but not a complete and total lack of mental awareness," the Fifth District disagreed with, and then certified conflict with, <u>Mathis</u> "to the extent that <u>Mathis</u> can be read as equating 'mental deficiency' [sic] with competence to testify, or to mean a total or complete lack of mental capacity or understanding." <u>Id.</u> The Fifth District also receded from its earlier panel decision in <u>Torresgrossa</u> to the extent that it had positively relied on <u>Mathis</u>. <u>Id.</u>

**ANALYSIS**

---

2. Despite using the term "mentally deficient," the Fifth District accurately recognized the operative phrase "incapable of appraising the nature of his or her conduct" that is part of the statutory definition of "mentally defective" provided in section 794.011(1)(b).

- 10 -

The conflict presented to the Court in this case concerns a matter of statutory interpretation, which is a question of law that is subject to de novo review. See Raymond James Fin. Servs., Inc. v. Phillips, 126 So. 3d 186, 190 (Fla. 2013). "A court's purpose in construing a statute is to give effect to legislative intent, which is the polestar that guides the court in statutory construction." Larimore v. State, 2 So. 3d 101, 106 (Fla. 2008). "When considering the meaning of terms used in a statute, this Court looks first to the terms' ordinary definitions[, which] . . . may be derived from dictionaries." Trinidad v. Fla. Peninsula Ins. Co., 121 So. 3d 433, 439 (Fla. 2013) (quoting Metro Cas. Ins. Co. v. Tepper, 2 So. 3d 209, 214 (Fla. 2009)).

Originally enacted in 1974, section 794.011 is Florida's sexual battery statute. In this case, Dudley was convicted by a jury of violating subsection (4)(e) of the sexual battery statute, which provides as follows:

> (4)  A person who commits sexual battery upon a person 12 years of age or older without that person's consent, under any of the following circumstances, commits a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, s. 775.084, or s. 794.0115:
> . . . .
> (e)  When the victim is mentally defective and the offender has reason to believe this or has actual knowledge of this fact.

§ 794.011, Fla. Stat. The term "mentally defective," which is the focal point of our analysis, is defined by section 794.011(1)(b) as "a mental disease or defect which

renders a person temporarily or permanently incapable of appraising the nature of his or her conduct." § 794.011(1)(b), Fla. Stat.

In its decision below, the Fifth District rejected the First District's prior interpretation of the term "mentally defective," which equated the term with "legal insanity" and further suggested that anyone with a sufficient mental capacity to competently testify in a court cannot be found "mentally defective." Dudley, 64 So. 3d at 751. Specifically, in Mathis, 682 So. 2d at 180, the First District explained that the "similarity" between the statutory definition of "mentally defective" and the definition of legal insanity used in Florida criminal proceedings is "apparent." The First District further stated, in analyzing the legal sufficiency of the evidence of whether the victim in Mathis was "mentally defective," that children having a "chronological age younger than the alleged victim's 'mental and developmental age' have been found to possess a sufficient understanding of the difference between the truth and a lie, and the moral obligation to relate the former rather than the latter, so as to be competent to testify in court." Id. at 181.

The Fifth District certified conflict with Mathis on two interrelated issues concerning the proper interpretation of the statutory term "mentally defective." See Dudley, 64 So. 3d at 752. First, the Fifth District certified conflict "to the extent that Mathis can be read as equating 'mental deficiency' [sic] with competence to testify." Id. Second, the Fifth District certified conflict "to the

- 12 -

extent that <u>Mathis</u> can be read . . . to mean a total or complete lack of mental capacity or understanding" is necessary for a finding that the victim was "mentally defective." <u>Id.</u> We address each conflict issue in turn.

## I. Equating "Mentally Defective" with Competence to Testify

The first conflict issue concerns the First District's statutory interpretation in <u>Mathis</u>, which equated the term "mentally defective" in the sexual battery statute with the concept of competence to testify. We agree with the Fifth District in <u>Dudley</u> that the First District's statutory interpretation of this term was flawed.

In <u>Mathis</u>, 682 So. 2d at 181, the First District held that "the evidence presented was legally insufficient to permit a reasonable jury to find that the alleged victim was 'mentally defective' on the date of the alleged sexual battery." In reaching this conclusion, the First District applied the facts of <u>Mathis</u> to a test for competence to testify, stating as follows:

> On appeal, the state argues that a reasonable juror might infer, from the alleged victim's IQ and "mental and developmental age" some fifteen months before the date of the alleged sexual battery, that the alleged victim was "mentally defective" on the date of the alleged sexual battery. We disagree. No evidence was offered as to the correlation, if any, between IQ and "mental and developmental age," and the ability to understand "the nature" of one's "conduct." Children having a chronological age younger than the alleged victim's "mental and developmental age" have been found to possess a sufficient understanding of the difference between the truth and a lie, and the moral obligation to relate the former rather than the latter, so as to be competent to testify in court. In fact, in this case, the trial court concluded, we believe correctly, that the alleged victim was competent to testify.

- 13 -

Id. at 180-81 (citations omitted).

Competence to testify is an entirely different legal concept than the term "mentally defective," as defined in the sexual battery statute. In Florida, a person is disqualified to testify as a witness when the court determines that the person is "[i]ncapable of expressing himself or herself concerning the matter in such a manner as to be understood, either directly or through interpretation by one who can understand him or her," or "[i]ncapable of understanding the duty of a witness to tell the truth." § 90.603, Fla. Stat. (2013).

As recognized by the Fourth District in Bowman, 760 So. 2d at 1055, competence to testify and mental defectiveness are distinct concepts that are not properly equated. In concluding that a finding that the victim was competent to testify was not inconsistent with a finding of the victim being "mentally defective," the Fourth District stated as follows:

> We do not see a problem, as the Mathis court may have, with a victim being found able to understand the moral obligation to testify truthfully, and still being mentally defective under the statutory definition. It is not unusual for a child who is actually or mentally five years old to sufficiently understand the moral obligation to tell the truth so as to be competent to testify. Telling the truth is a basic value of our society which is drummed into the heads of children as soon as they are able to reason. The fact that such a child is competent to testify, however, is not inconsistent with being mentally defective under section 794.011(1)(b), Florida Statutes. Unlike telling the truth, the inappropriateness of the type of sexual activity occurring in Mathis or this case is not necessarily something which is normally discussed with a person who is mentally only five years old.

- 14 -

Id.  We agree with the Fourth District in <u>Bowman</u>, which was cited affirmatively by the Fifth District in its decision below, and conclude that the First District in <u>Mathis</u> erred in relying on the concept of competence to testify in analyzing whether a victim falls within the statutory definition of "mentally defective."  We therefore disapprove the First District's statutory interpretation in <u>Mathis</u> on this issue.

We turn next to the second conflict issue certified by the Fifth District.

## II.  An "Unreasonably Narrow Reading" of the Statutory Term "Mentally Defective"

In addition to disagreeing with the First District's decision in <u>Mathis</u> on the basis that the First District improperly equated the statutory term "mentally defective" with competence to testify, the Fifth District also disagreed with the First District's interpretation of the term "mentally defective" to "mean a total or complete lack of mental capacity or understanding."  <u>Dudley</u>, 64 So. 3d at 752.  This conflict issue is premised on the Fifth District's holding that the First District's comparison in <u>Mathis</u> between "mentally defective" and the concept of "legal insanity" suggested an "unreasonably narrow reading of the term."  Id. at 751.

The relevant criminal statute defining legal insanity in Florida provides as follows:

(1) AFFIRMATIVE DEFENSE.—All persons are presumed to be sane.  It is an affirmative defense to a criminal prosecution that, at the time of the commission of the acts constituting the offense, the defendant was insane.  Insanity is established when:

(a)  The defendant had a mental infirmity, disease, or defect; and

(b)  Because of this condition, the defendant:

1.  Did not know what he or she was doing or its consequences; or

2.  Although the defendant knew what he or she was doing and its consequences, the defendant did not know that what he or she was doing was wrong.

Mental infirmity, disease, or defect does not constitute a defense of insanity except as provided in this subsection.

§ 775.027, Fla. Stat. (2013).  By contrast, the term "mentally defective" in the sexual battery statute is defined as "a mental disease or defect which renders a person temporarily or permanently incapable of appraising the nature of his or her conduct."  § 794.011(1)(b), Fla. Stat.

Other than both statutory definitions including the words "mental," "disease," and "defect," the definitions are noticeably different.  For example, the definition of "insanity" set forth in section 775.027 uses the verb "know" to describe the requisite mental state, whereas the definition of "mentally defective" uses the verb "appraise."  Those different verbs also modify different objects— "what [the defendant] was doing or its consequences" for insanity, versus "the nature of [the victim's] conduct" for mentally defective.

Moreover, not only are the two statutory definitions textually dissimilar, but the statutes also differ greatly in application.  "Insanity" is an affirmative defense

- 16 -

asserted by a defendant to avoid criminal responsibility, with the burden on the defendant to prove the defense by clear and convincing evidence. § 775.027(2), Fla. Stat. On the other hand, the State must prove beyond a reasonable doubt, as an element of the offense, that the victim was "mentally defective" to impose criminal responsibility on a defendant for sexual battery on such a person. § 794.011, Fla. Stat.

We agree with the Fifth District's conclusion that the term "mentally defective" cannot be equated with the definition of insanity, and that it "cannot reasonably be read to mean a total lack of mental capacity, as the trial judge in [this] case seems to have concluded based upon language in Mathis and [the Fifth District's prior panel decision in] Torresgrossa," which cited Mathis for the proposition that the definition of "mentally defective" is similar to the definition of insanity.[3] Dudley, 64 So. 3d at 752; Torresgrossa, 776 So. 2d at 1011. The word "defective" is defined as "a person who is subnormal physically or mentally"; "imperfect in form or function"; or "falling below the norm in structure or in mental or physical function." Merriam-Webster's Collegiate Dictionary 302 (10th ed. 1999). As stated by the Fifth District, the statutory definition of "mentally

---

3. We note, once again, that the Fifth District inadvertently referenced the incorrect term "mentally deficient" in its analysis. However, while the court utilized the wrong term, we nevertheless embrace the Fifth District's underlying and well-reasoned conclusion on this issue.

defective"—that is, "incapable of appraising the nature of his or her conduct"— thus "connotes significantly diminished judgment, but not a complete and total lack of mental awareness." Dudley, 64 So. 3d at 752.

Accordingly, we hold that the First District in Mathis erred to the extent it suggested that, in order to conclude that a victim was "mentally defective" under the sexual battery statute, the victim must display "a total or complete lack of mental capacity or understanding." Id. To the contrary, we conclude that the Fifth District in Dudley properly construed the sexual battery statute to determine that the evidence in this case was "clearly sufficient to support a jury finding that the victim was mentally defective, as defined by the statute." Id. at 747.

## CONCLUSION

For the reasons set forth above, we approve the Fifth District's decision in Dudley, consistent with the analysis we adopt in this opinion, and disapprove the First District's statutory interpretation in Mathis.

It is so ordered.


PARIENTE, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., concurs in result.
LEWIS, J., concurs in result only, with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LEWIS, J., concurring in result only.

I concur in result only because while I do agree with the result of the district court of appeal below, I cannot agree with the entirety of its reasoning. In a similar fashion, I agree with the result of the majority, but not entirely with its reasoning or analysis. In my view, the Legislature intended the applicable statutory provision to establish broad protections for victims of abuse in this area. Yet, the words of limitation from the district court below and the limitations in the discussion of the protections afforded by the statute here do not provide a scope of protection to victims as established by the statutory provision.

Instead of providing clarity to this area of law by specifically articulating the wide scope of protections afforded by the statute, the majority focuses its opinion on reaching the rather obvious conclusion that the term "mentally defective," defined by section 794.011, Florida Statutes (2007), to mean that a "mental disease or defect which renders a person temporarily or permanently incapable of appraising the nature of his or her conduct," does not equate to the legal definitions of either insanity or competency. Furthermore, I cannot agree with the majority's reliance on what the majority describes as the "well-reasoned conclusion" of the Fifth District that the term "mentally defective" means "significantly diminished judgment, but not a complete and total lack of mental awareness." See Majority

- 19 -

Op. at 17 n.3, 18; State v. Dudley, 64 So. 3d 746, 752 (Fla. 5th DCA 2011). That is far too limited.

In fact, neither the majority nor the Fifth District has attempted to actually discuss the parameters of the statutory definition of "mentally defective." Both courts have skirted the issue, utilizing the dictionary definitions of the words "defective" or "deficient" to define a phrase that has already been defined by section 794.011(1)(b) to mean "incapable of appraising the nature of his or her conduct." Quite simply, by failing to even attempt to provide a field of operation for the statutory definition of "mentally defective" as it was articulated by the Legislature, the majority has emasculated the legislative design that was clearly intended to broadly protect certain persons from being taken advantage of and sexually abused.

Accordingly, because I cannot ascribe to the majority's limited interpretation of the statutorily defined term "mentally defective," I concur in result only.

Application for Review of the Decision of the District Court of Appeal - Certified Direct Conflict of Decisions

Fifth District – Case No. 5D10-2863

(Volusia County)

Clyde M. Taylor, III of Taylor & Taylor, PA, St. Augustine, Florida,

for Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; Wesley Heidt, Bureau Chief, Criminal Appeals, and Pamela Jane Koller, Assistant Attorney General, Daytona Beach, Florida,

for Respondent