IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

N.H., A CHILD,

      Petitioner,

 v.

                              Case No. 5D23-795
                              LT Case No. 2023-CJ-000120

STATE OF FLORIDA,

      Respondent.

_____/

Opinion filed March 27, 2023

Petition for Writ of Habeas Corpus,
A case of Original Jurisdiction.

Charlie Cofer, Public Defender, and
Elizabeth Hogan Webb, Assistant Public
Defender, Jacksonville, for Petitioner.

Ashley Moody, Attorney General, and
Daren Shippy, Assistant Attorney
General, Tallahassee, for Respondent

BOATWRIGHT, J

N.H., a minor child, petitions this Court for a writ of habeas corpus after she was placed in home detention. N.H. challenges the finding of probable cause at her detention hearing. Because the trial court properly found that the detention order was supported by probable cause, we deny the petition.

## Background

N.H. was a student attending public school in Duval County, Florida on the day of the incident. On top of N.H.'s desk, one of her teachers ("the Teacher") observed a piece of paper in plain sight containing a written threat to kill the Teacher and one of N.H.'s other teachers. One side of the paper read "N.H.'s hunting and fishing show," followed by a list of items, including a camera and a microphone, a fishing pole, a fishing line, and—notably—a gun. The other side said, "Kill," and then listed the Teacher's last name and the last name of another teacher of N.H. After viewing the threatening kill list on N.H.'s paper,[1] the Teacher promptly reported it to the school's principal, who then notified the school's resource officer.

The school then contacted N.H.'s mother, who informed the school staff that she had found a journal containing some alarming statements at

---

[1] At the detention hearing, the assistant state attorney represented to the court that he had spoken to the school resource officer, who advised that the Teacher had seen the word "Kill" on the paper while N.H. was at her desk.

2

N.H.'s house approximately a week before, then N.H.'s mother gave the journal to the school resource officer. The journal contained a written plan to kill others, including N.H.'s family members and the Teacher. N.H.'s journal listed weapons that would be used, including a knife, gun, rope, and pocketknife, along with times, such as "12:50 school" and "3:01 school." Based on these facts, N.H. was arrested for violating section 836.10, Florida Statutes (2022), which is entitled: "Written or electronic threats to kill, do bodily injury, or conduct a mass shooting or an act of terrorism."

At the ensuing detention hearing, N.H.'s counsel argued that there was no probable cause to believe an offense had been committed because the State could not prove N.H.'s written note was "sent, posted, or transmitted" within the meaning of section 836.10. The State responded by arguing that section 836.10 was applicable because the Teacher saw the written threat to kill on N.H.'s desk while N.H. was sitting at the desk.

After considering the arguments and evidence, the trial court found there was probable cause for the charge. N.H.'s detention risk assessment score warranted secure detention, but the court, in its discretion, released N.H. to her mother on intensive home detention.

N.H. subsequently filed the instant petition for a writ of habeas corpus in which she again argues that the State did not establish probable cause to

3

support her detention for the act of "sending, posting, or transmitting" a written threat to kill in violation of section 836.10. N.H. argues that section 836.10 requires a showing of some affirmative act on behalf of the defendant evidencing an intent to communicate the writing's contents. N.H. does not: (1) challenge that the paper contained a written threat to kill, (2) claim that this was an expression of fantasy or imagination, (3) deny that she prepared the written threat, or (4) deny that she placed it where the Teacher could view it. The State's position is that because N.H. "publicly displayed" the kill list on top of her desk at school, she had "posted" it within the meaning of the statute. We agree with the State.

## Analysis

The legality of a juvenile's detention may be properly challenged through the filing of a petition for writ of habeas corpus. N.W. v. State, 300 So. 3d 803, 804 (Fla. 1st DCA 2020) (citations omitted). This includes issues related to the trial court's probable cause determination under Florida Rule of Juvenile Procedure 8.010. L.A. v. Carter, 623 So. 2d 1219, 1220 (Fla. 3d DCA 1993). At a detention hearing, the finding of probable cause is determined in a nonadversarial proceeding where the trial court must determine whether there is probable cause to believe the child has committed a delinquent act. Fla. R. Juv. P. 8.010(g)(1). In making this

4

determination, the court shall apply the standard of proof necessary for an arrest warrant, and its finding may be based upon a sworn complaint, affidavit, deposition under oath, or, if necessary, upon testimony under oath properly recorded. Id.

The nonadversarial nature of the proceeding does not require presentation of witnesses and full exploration of their testimony on cross-examination to determine probable cause. See Gerstein v. Pugh, 420 U.S. 103, 120 (1975). "[Probable cause] does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands"; instead, it is found through informal modes of proof, such as written testimony and hearsay. Id. at 121. As such, there is no requirement that a trier of fact resolve disputes in the evidence in order for probable cause to be found.

"'Probable cause' means a reasonable ground of suspicion supported by circumstances strong enough in themselves to warrant a cautious person in belief that the named suspect is guilty of the offense charged." Johnson v. State, 660 So. 2d 648, 654 (Fla. 1995) (citing Dunnavant v. State, 46 So. 2d 871 (Fla. 1950)). "Probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity'; it 'is not a high bar.'" J.J. v. State, 312 So. 3d 116, 119 (Fla. 3d DCA 2020) (quoting

District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018)). "**Probable cause doesn't require proof that something is more likely true than false**. It requires only a **fair probability**, a standard understood to mean something more than a bare suspicion but less than a preponderance of the evidence at hand." Id. at 120 (quotations and citations omitted in original) (quoting United States v. Denson, 775 F.3d 1214, 1217 (10th Cir. 2014)). Probable cause is also often a conclusion drawn from reasonable inferences. State v. Cote, 547 So. 2d 993, 995 (Fla. 4th DCA 1989). Thus, "[i]n dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is . . . correlative to what must be proved." Gerstein, 420 U.S. at 121 (quoting Brinegar v. United States, 338 U.S. 160, 174–75 (1949)).

Determinations of reasonable suspicion and probable cause are reviewed de novo on appeal. Jenkins v. State, 978 So. 2d 116, 122 (Fla. 2008) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)). "However, the court should review findings of historical fact only for clear error and give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Id.

As N.H. did not contest that she prepared the kill list, the dispositive question is whether there was probable cause to find that N.H.'s act of placing it on her desk constituted the "posting" of a written threat to kill in violation of section 836.10(2). The current operative version of section 836.10(2) provides:

> (2) It is unlawful for any person to send, post, or transmit, or procure the sending, posting, or transmission of, a writing or other record, including an electronic record, in any manner in which it may be viewed by another person, when in such writing or record the person makes a threat to:
>
> (a) Kill or to do bodily harm to another person; or
>
> (b) Conduct a mass shooting or an act of terrorism.
>
> A person who violates this subsection commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

The term "post," which is in dispute, is not defined under chapter 836.

When interpreting a statute, Florida courts adhere to the "supremacy-of-text principle," meaning that "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." Ham v. Portfolio Recovery Assocs., LLC, 308 So. 3d 942, 946 (Fla. 2020) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56 (2012)); Richman v. Calzaretta, 338 So. 3d 1081, 1082 (Fla. 5th DCA 2022). Consequently, "[t]he words of a statute are

7

to be taken in their natural and ordinary signification and import; and if technical words are used, they are to be taken in a technical sense." Lab'y Corp. of Am. v. Davis, 339 So. 3d 318, 323 (Fla. 2022) (quoting James Kent, Commentaries on American Law 432 (1826), quoted in Scalia & Garner, Reading Law at 69 n.1).

According to the Florida Supreme Court, when "the [L]egislature has not defined the words used in a [statute], the language should be given its plain and ordinary meaning." Debaun v. State, 213 So. 3d 747, 751 (Fla. 2018) (quoting Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Sch., Inc., 3 So. 3d 1220, 1233 (Fla. 2009)). "When considering the [plain] meaning of terms used in a statute, this Court looks first to the terms' ordinary definitions [,which] . . . may be derived from dictionaries." Id. (quoting Dudley v. State, 139 So. 3d 273, 279 (Fla. 2014)); see also Kidwell Grp., LLC v. ASI Preferred Ins. Corp., 351 So. 3d 1176, 1179 (Fla. 5th DCA 2022); Conage v. United States, 346 So. 3d 594, 598 (Fla. 2022) ("When a contested term is undefined in statute or by our cases, we presume that the term bears its ordinary meaning at the time of enactment, taking into consideration the context in which the word appears. And we typically look to dictionaries for the best evidence of that ordinary meaning.").

8

As the State has argued that the writing in question was "publicly displayed," it is thus important to focus on the word "post" as used in section 836.10(2)(a). Because Chapter 836 does not define "post," the best evidence of the ordinary meaning of that term is the dictionary definition.

The Macmillan English Dictionary defines "post" as "to put information or a message where the public can see it." Post, Macmillan English Dictionary (2d ed. 2007).[2] The American Heritage Dictionary defines "post" as "[t]o display (an announcement) in a place of public view." Post, The American Heritage Dictionary of the English Language (5th ed. 2016).[3] In turn, "display" is defined as "[t]o present to view; cause to be seen." Display, The American Heritage Dictionary of the English Language (5th ed. 2016).

---

[2] The Dissent utilizes Black's Law Dictionary to define "post." However, it is more appropriate to use a dictionary that would define the words as to what a reasonable person would understand the words to mean at the time the statute was enacted and not a technical legal definition. See Lab'y Corp. of Am., 339 So. 3d at 323 ("The words of a statute are to be taken in their natural and ordinary signification and import; and if technical words are used, they are to be taken in a technical sense." (internal quotation omitted)). N.H. has not argued that "post" is a legal term of art.

[3] The Dissent also focuses on the word "announcement" used in this definition, but we note, grammatically speaking, the use of parentheses indicates that the term "announcement" is extraneous information. See Bryan A. Garner, The Redbook: A Manual on Legal Style 28 (3d ed. 2013). In any event, the definition of "announcement" is "[t]he act of making known publicly," Announcement, The American Heritage Dictionary of the English Language (5th ed. 2011), which conforms with the provided definitions.

Given these definitions, the plain and ordinary meaning of "post," as used in section 836.10(2)(a), can be understood as making it unlawful to cause a writing, which threatens to kill or do bodily harm to another person, to be seen in public. Significantly, regarding causing a writing to be seen in public, section 836.10(2)(a) explicitly states that this can be accomplished "in any manner in which it may be viewed by another person." Therefore, the mode or means whereby the written threat to kill is made public does not matter as long as it can be viewed by another person.

Based on the foregoing, there was sufficient probable cause for the trial court to find that N.H. violated section 836.10 when she placed a written threat to kill her teacher, on her desk, out in the open in a public school classroom. There is no indication that N.H. tried to hide the written threat that she placed on her desk; rather, she placed the kill list on her desk, in plain view in a public setting where her teacher was able to view it. Therefore, N.H.'s acts can be characterized as the posting of a writing that threatens to kill another person in any manner in which it may be viewed by another person.

N.H.'s argument that she did not intend to communicate the writing to anyone in public is unavailing. We acknowledge that Florida courts, when interpreting previous versions of section 836.10, have concluded that there

10

is a "mens rea" element present in the statute.[4] See N.D. v. State, 315 So. 3d 102, 105 (Fla. 3d DCA 2020); T.R.W. v. State, 48 Fla. L. Weekly D341c (Fla. 4th DCA Feb. 15, 2023); Smith v. State, 532 So. 2d 50, 52 (Fla. 2d DCA 1988). Those same courts have indicated that determining the defendant's intent is a question reserved for the trier of fact. See T.R.W., 48 Fla. L. Weekly at D341c; Puy v. State, 294 So. 3d 930, 933 (Fla. 4th DCA 2020); State v. Cowart, 301 So. 3d 332, 335 (Fla. 5th DCA 2020); see also State v. Williamson, 348 So. 3d 48, 51 (Fla. 5th DCA 2022) (holding that the question of intent is precisely the type of question that should be left to the trier of fact). The reason for this is that intent is normally "inferred from the acts of the parties and the surrounding circumstances. Being a state of mind, intent is usually a question of fact to be determined by the trier of fact," who "has the opportunity to observe all of the witnesses." State v. West, 262 So. 2d 457, 458 (Fla. 4th DCA 1972) (internal citations omitted); see also State v. Jones, 642 So. 2d 804, 806 (Fla. 5th DCA 1994) (finding that "[i]ntent is generally a question for the trier of fact because a defendant's mental intent is hardly ever subject to direct proof and must be established by

---

[4] Florida courts when reviewing different versions of section 836.10 have focused on whether the written communication was intended to be an actual threat and not whether intent to actually communicate or post the threat is necessary. The courts differ as to whether intent in this regard is subjective or objective.

11

surrounding circumstances"). As stated previously, factual disputes reserved for the trier of fact are not at issue in a nonadversarial probable cause determination. See Gerstein, 420 U.S. at 121. Therefore, the trial court, during the nonadversarial probable cause determination, was not required to find intent on N.H.'s behalf in order to find probable cause.

## Conclusion

Accordingly, we deny the petition as the trial court properly found probable cause. It is important to note that we are merely affirming the trial court's finding that there was probable cause to believe N.H. violated section 836.10, which requires only a probability or substantial chance of criminal activity and not an actual showing of such activity. J.J., 312 So. 3d at 119. N.H. is free to raise such defenses as she may have and to require the State meet its burden of proof in later proceedings.

DENIED.

EDWARDS, J., concurs.
MACIVER, J., dissents, with opinion.

12

MACIVER, J., dissenting.

I am unable to join in the majority denial of the petition. Petitioner argues that her liberty is presently restrained without a genuine finding of probable cause. I agree. The probable cause burden is a low bar, but it is not a rubber stamp. Based on the facts presented at the probable cause determination hearing, it was not met here.

At the detention hearing, the trial court must first determine whether probable cause exists, and if so, whether other statutory needs of detention exist. Fla. R. Juv. P. 8.010(h); § 985.255(3)(a), Fla. Stat. (2022). "If the court finds that such probable cause does not exist, it shall forthwith release the child from detention." Fla. R. Juv. P. 8.010(h). Indeed, it is a fundamental principle of American law that a person's liberty cannot be significantly restrained without probable cause that a criminal act has or is being committed.

The relevant testimony at the detention hearing follows:

THE COURT: As for PC, Ms. Ches?

MS. CHES: Your Honor, these papers were found on her desk by one of the teachers who's listed in the threat. She was on -- she was at the desk with the paper, she had just written it. I did speak to this officer, I think yesterday, as did Ms. Liesch, authorizing, you know, this charge based on the fact

13

that the victim saw the piece of paper with the words kill, and the names underneath it. And then the additional information gathered from the journal at home with her plans to kill others. I acknowledge that that is not part of this charge; however, it is part of the underlying concern the State has with this written threat that was observed by the teacher.

THE COURT: Okay. I think it's enough PC …

Petitioner is detained based upon a finding of probable cause that she violated section 836.10(2), Florida Statutes (2022), which provides:

(2) It is unlawful for any person to send, post, or transmit, or procure the sending, posting, or transmission of, a writing or other record, including an electronic record, in any manner in which it may be viewed by another person, when in such writing or record the person makes a threat to:

(a) Kill or to do bodily harm to another person; or

(b) Conduct a mass shooting or an act of terrorism.

A person who violates this subsection commits a felony of the second degree . . . .

No argument is made that the actions in this case constitute "sending" or "transmitting" a written threat. The dispute turns entirely upon the statutory interpretation of the term "post"; specifically, what activity reasonably may be found to fall within the term "post." Petitioner argues that the plain language of section 836.10, Florida Statutes (2022), as outlined in the jury instruction, makes clear that such a threat must be, in some manner, relayed or

14

dispatched. In answer, the State cites to several cases in which the perpetrator expressly acted to relay the threat in question. The State then argues that the "public display in this case of her written threat to Teacher #1 is analogous to her posting the threat on social media, which is sufficient to violate the statute."

The State's argument is, essentially, that because the paper was in a public place where it might be viewed by another person, the author had "posted" the written threat. For the reasons that follow, I cannot agree with the State's position and believe that Petitioner argues the better understanding of the law.

When interpreting a statute, Florida courts adhere to the "supremacy-of-text principle," which means "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 946 (Fla. 2020) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012)); *Richman v. Calzaretta*, 338 So. 3d 1081, 1082 (Fla. 5th DCA 2022). Further, "[w]hen a contested term is undefined in statute or by our cases, we presume that the term bears its ordinary meaning at the time of enactment, taking into consideration the context in which the word appears." *Conage v. United States*, 346 So. 3d

15

594, 599 (Fla. 2022). In *Conage*, the Florida Supreme Court receded from the opinion that the ordinary-meaning principle required a court to end its statutory analysis when the terms had an unambiguous fixed meaning. *See id.* at 598. There the Court observed:

> It would be a mistake to think that our law of statutory interpretation requires interpreters to make a threshold determination of whether a term has a "plain" or "clear" meaning in isolation, without considering the statutory context and without the aid of whatever canons might shed light on the interpretive issues in dispute.

*Id.*

At risk of oversimplification, a primary takeaway from *Conage* is that context always matters. Similarly illustrated:

> Of course, words are given meaning by their context, and context includes the purpose of the text. The difference between textualist interpretation and so-called purposive interpretation is not that the former never considers purpose. It almost always does. The subject matter of a document (its purpose, broadly speaking) is the context that helps to give words meaning . . . .

Scalia & Garner, *supra*.

So, what context can we derive from the text of the statute? As a starting point, the State of Florida has not criminalized bad thoughts. Even the most wicked of hypothetical deeds is not against the law when it exists only in one's imagination. Even when those thoughts are reduced to writing,

16

the State of Florida has not chosen to criminalize such behavior. The text of the statute does not prohibit the writing alone, but rather the sending, transmitting, or posting of the writing. Imagination and fantasy, in writing, is recognized as just that. That the fantasy may evince something more provides a strong incentive for some form of familial and social intervention, but it is not criminalized. What the State has criminalized is the making of threats. The difference between a disturbing thought that has been reduced to writing and the making of a threat is the existence of a communicative act—a sending, transmitting, or posting. That Petitioner was caught at her desk with the writing is not the same as Petitioner taking any step to communicate the thoughts as a threat.

In my view, the plain meaning of the word "post"—read within the context illustrated above—is sufficient to resolve any suggested ambiguity. To the extent that doubt lingers, we can turn next to definitions found in reliable dictionaries. Again, we are compelled to rely on context to choose between competing definitions and to identify the boundaries of those respective definitions.

*The American Heritage Dictionary* defines "post" as "[t]o display (an announcement) in a place of public view." *Post*, The American Heritage Dictionary of the English Language,

17

https://ahdictionary.com/word/search.html?q=post (last visited Feb. 13, 2023). Of note is the fact that the thing displayed in a place of public view is "an announcement." It does not refer to the display of one's generalized thoughts or considerations. To "post" is to display "an announcement." It is, in short, to *announce*. That Petitioner was caught at her desk with the writing is not the same as the Petitioner *announcing* the thoughts as a threat.

We can look as well to *Black's Law Dictionary*, which defines "post" as "to publicize or announce by affixing a notice in a public place." *Post*, *Black's Law Dictionary* (9th ed. 2004). Again, the definition refers to an act of communication—"publicize or announce." That Petitioner was caught at her desk with the writing is not the same as the Petitioner *publicizing* or *announcing* the thoughts as a threat.

While not relevant to the textual mandate of the statute, I do observe the policy considerations at play here. The seriousness of mass violence certainly compels the most determined response—both legislatively and judicially. However, criminal prosecution is not the only tool available, and the overuse of criminal justice solutions—for example, placing a child in jeopardy of a second-degree felony—might crowd out other more rational and reasonable approaches.

Finally, I need to address the peculiarity of writing a dissent, where constitutionally I would have the authority to unilaterally order the writ over my own signature. "A district court of appeal or *any judge thereof* may issue writs of habeas corpus returnable before the court or any judge thereof or before any circuit judge within the territorial jurisdiction of the court." Art. V, § 4(b)(3), Fla. Const. (emphasis added). The writ of habeas corpus is only the demand that the person in custody be brought before a court. Typically, the order issuing the writ will also include the direction to that court to release the petitioner—due to the underlying error leading to the unlawful custody. The authority to decide the underlying issue and order the remedy is, in my view, separate from the authority to order the petitioner's appearance before a court. The court below has already made (in my opinion, in error) a probable cause determination. The authority to reverse that determination is attendant but still separate from the habeas corpus writ, and thus falls within the authority of the court, not any individual judge. Appellate courts must exercise their authority by decision of either a three-judge panel or by a decision *en banc*. Because I lack the authority to unilaterally order the dismissal of the case below, an order to produce the Petitioner would, by itself, be fruitless. I therefore respectfully dissent from the denial of the writ.